**Kevin W. REYNOLDS, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2001–CA–001467–MR.

Court of Appeals of Kentucky.

Aug. 15, 2003.

As Modified Aug. 29, 2003.

Dennis Stutsman, Frankfort, KY, for appellant.

Albert B. Chandler, Attorney General, J. Gary Bale, Assistant Attorney General, Frankfort, KY, for appellee.

Before COMBS, McANULTY, and PAISLEY, Judges.

*OPINION*

McANULTY, Judge.

Kevin W. Reynolds appeals from a judgment of the Carroll Circuit Court sentencing him to ten years in prison[1] after a jury found him guilty of escape in the second degree and being a persistent felony offender in the first degree. Reynolds contends the trial court erred by denying his request for a directed verdict. We disagree, and thus affirm the judgment.

On November 15, 2000, in Gallatin County, Reynolds pled guilty to the misdemeanor offense of possession of a controlled substance in the second degree (cocaine), first offense (Kentucky Revised Statutes (KRS) 218A.1416). He was sentenced to twelve months in the county jail with service of the sentence to begin on December 27, 2000. Under an agreement with Gallatin County, Reynolds was to be placed in the Carroll County Detention Center for service of his sentence.[2] On December 18, 2000, the trial court granted Reynolds's request for work-release by entering an order allowing him to be released for work Monday through Saturday at 7:15 a.m. until 5:00 p.m. the same day. Reynolds reviewed and signed the orders. Shortly after beginning service of his sentence, Reynolds properly arranged to switch employers under his work-release and began working for Ralph Asher, who owned a small construction business. Under an affidavit signed by Asher, he agreed to be responsible for supervising Reynolds and notifying jail personnel if he wanted Reynolds to work beyond or outside the authorized hours in the work-release order. With the permission of the judge, the work-release order was modified to a sign-out time of 7:00 a.m. to allow Reynolds to get to the job site.

From the first day of entering the Carroll County Detention Center, Reynolds was allowed work-release without any problem pursuant to the trial court's order. On January 19, 2001, however, Reynolds signed out of the jail shortly before 7:00 a.m. but failed to return by the designated return time. Jail personnel contacted Asher's wife, who told them Reynolds had last been seen at approximately 4:30 p.m. Jail personnel notified the county sheriff, who was unable to locate Reynolds. At approximately 8:15 a.m. the next morning, January 20, 2001, Reynolds returned to the Carroll County Detention Center. He was given a preliminary breathalyzer test, which was negative, but he refused to take a urinalysis drug test.

On February 12, 2001, the Carroll County grand jury indicted Reynolds on one felony count of escape in the second degree (KRS 520.030) and for being a persistent felony offender in the first degree (PFO I)(KRS 532.080). During a trial held on April 27, 2001, the Commonwealth

---

1. The judgment also imposed a fine of $1,000.

2. The Carroll County Detention Center is a regional detention facility that houses prisoners for several counties, including Gallatin County, under separate compensation contracts. *See* KRS 441.050(7).

called seven witnesses including jail personnel, Ralph Asher, two of Reynolds's co-workers, Billy Wright and Martin Gills, and the Gallatin County Commonwealth's Attorney. Reynolds testified on his behalf for the defense. At the close of the Commonwealth's case and the close of all the evidence, Reynolds's attorney moved for a directed verdict, which the trial court denied. The jury found Reynolds guilty on both counts and recommended sentences of two years on the escape charge enhanced to ten years on the PFO I charge. On May 21, 2001, the trial court sentenced Reynolds to ten years' imprisonment for escape in the second degree and being a PFO I consistent with the jury's recommendation.[3] This appeal followed.

■▬▬ Reynolds challenges the trial court's denial of his motions for a directed verdict of acquittal. In *Commonwealth v. Benham*, Ky., 816 S.W.2d 186 (1991), the Kentucky Supreme Court delineated the standard for handling a criminal defendant's motion for directed verdict as follows:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Id.* at 187 (citing *Commonwealth v. Sawhill*, Ky., 660 S.W.2d 3 (1983)). *See also Norris v. Commonwealth*, Ky., 89 S.W.3d 411, 416 (2002). A court must be mindful of the rule that "[c]redibility and weight of the evidence are matters within the exclusive province of the jury." *Commonwealth v. Smith*, Ky., 5 S.W.3d 126, 129 (1999) (citations omitted). Jurors are free to believe parts and disbelieve other parts of the evidence including the testimony of each witness. *Id.* The standard for appellate review of a denial of a motion for directed verdict alleging insufficient evidence dictates that if under the evidence as a whole it would not be clearly unreasonable for a jury to find the defendant guilty, he is not entitled to a directed verdict of acquittal. *Benham*, 816 S.W.2d at 187; *Holbrooks v. Commonwealth*, Ky., 85 S.W.3d 563, 569 (2002).

Reynolds contends that there was insufficient evidence to convict him of escape in the second degree. More specifically, he argues that while the evidence may establish that he violated the terms of his work-release, it was insufficient to prove the culpable mens rea or intent not to return to the Carroll County Detention Center.

■▬ KRS 520.030 provides in part that "[a] person is guilty of escape in the second degree when he escapes from a detention facility...." KRS 520.010(5) defines "escape" in relevant part as "failure to return to ... detention following a temporary leave granted for a specific purpose or for a limited period[.]" Finally, a "detention facility" includes any building used for confinement of a person convicted of an offense. KRS 520.010(4). A defendant in jail on a misdemeanor conviction who fails to return to jail at the designated time while out on work-release may be convicted of the felony offense of escape in the second degree. *See Commonwealth v. Johnson*, Ky.App., 615 S.W.2d 1 (1981).

---

**3.** *See infra* note 1.

■ The Penal Code[4] statutes creating the offense of felony escape do not indicate that the accused's mental state is a material element of the offense, but neither do they dispense with the requirement. Generally, a culpable mental state is required for offenses under the Penal Code. *See* KRS 501.030(2). Moreover, even though no culpable mental state is expressly designated in a criminal statute, it may be required if the proscribed conduct necessarily involves a culpable mental state. *See* KRS 501.040. The Penal Code provides for and defines four types of mental states: intentional, knowing, wanton and reckless. KRS 501.020. Reynolds's position assumes that an intentional mental state is an element of escape in the second degree. Specific intent generally is not required for a conviction for escape. *See* 27A Am.Jur.2d Escape § 3 (1996); *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). While other mental states arguably would be sufficient to support an escape conviction under the Penal Code, *Bailey, supra* (holding knowing state of mind sufficient for escape under federal statute); *see also Phipps v. Commonwealth*, Ky.App., 933 S.W.2d 825 (1996)(indicating knowing conduct sufficient for escape in the second degree), the trial court's instructions required the jury to find that Reynolds had "intentionally escaped from the Carroll County Regional Detention Facility by failing to return" from the court ordered work-release by the designated time.[5] Even though the intentional mens rea is a higher standard of culpability and more burdensome than the other three mental states, we will consider the sufficiency of the evidence for the jury verdict and the trial court's denial of the directed verdict motions consistent with the court's instructions.[6]

The evidence shows that Reynolds signed out of the Carroll County Detention Center on January 19, 2001, at 6:48 a.m.

4. Various miscellaneous criminal statutes were revised and collected in KRS Chapters 500 to 534, known as the Penal Code, which became effective on January 1, 1975. KRS 500.010.

5. The instructions also defined escape as "the departure from custody or the detention facility in which a person is held or detained with knowledge that the departure is unpermitted, or failure to return to custody or detention following a temporary leave granted for a specific purpose or for a limited period. The willful failure of a prisoner to return within the time prescribed to a detention facility to which he was committed constitutes an escape."

6. The mens rea aspect of the trial court's instructions appears to be predicated in large part on KRS 439.610, which was cited in the indictment in addition to KRS 520.030. KRS 439.610 states: "The willful failure of a prisoner to remain within the extended limits of his confinement, or to return within the time prescribed to an institution or facility to which he was committed or transferred to after commitment, constitutes an escape from custody punishable as provided in KRS 520.030." The precise interplay between this statute, which appears in the chapter dealing with probation and parole, and the escape provisions of the Penal Code is unclear. KRS 439.610 was originally enacted in 1972 as part of several statutory provisions dealing with the temporary release of state prisoners under the auspices of the Department of Corrections for purposes such as educational training, medical treatment, and paid employment. *See* Ky. Acts Ch. 293 (encompassing KRS 439.580 to KRS 439.630). "Institution" generally refers to a state penal entity, *see* KRS 186.010(4), and "facility" for purposes of KRS 439.610 is defined as a community correctional center as established by the Department of Corrections, *see* KRS 439.580(4). Consequently, KRS 439.610 arguably does not apply to Reynolds, who was serving a misdemeanor sentence and was not under the authority of the Department of Corrections. Furthermore, we note that our research indicates that KRS 439.610 has not been cited in any case. Nevertheless, this apparent anomaly does not affect the outcome of our decision.

He was driving his stepfather's truck that Friday morning. Billy Wright, to whom Reynolds gave a ride to work, brought along a cooler containing approximately 15 cans of beer. Despite bad weather consisting of snow and sleet, they worked at an undisclosed location but went to Ralph Asher's home/office around noon in order to pick up their paychecks. Upon distributing the paychecks, Asher told his employees they did not have to continue working because of the inclement weather. Reynolds and Wright then drove to the bank, to a gasoline station, and allegedly back to the job site in case the weather improved. During that time, Wright drank several beers and Reynolds drank 3–4 beers. The pair returned to Asher's home/office at approximately 4:00–4:30 p.m. to return tools that Reynolds remembered were in his truck. After leaving Asher's residence a short time later, Reynolds and Wright went to the Bun Boy Motel, where another co-worker, Danny Gills, was residing. All three continued to drink beer. Approximately two hours later, Reynolds left the motel but he testified that he had difficulty controlling his truck on the wet highway, so he pulled off onto the shoulder. Reynolds said he fell asleep and when he awoke early the next morning his truck was covered with snow. He stated that it took him several hours to extricate the truck from the sloped shoulder of the highway and then drive back to the jail on the icy roadway. Reynolds arrived back at the detention center at 8:15 a.m. on January 20, 2001. A breathalyzer test taken at that time registered zero for alcohol but Reynolds refused to take a urinalysis drug test.

Reynolds asserts that he was entitled to a directed verdict of acquittal on the escape charge. He does not dispute that the Carroll County Detention Center was a "detention facility" and that he failed to return to detention at the designated time

following a temporary leave granted for a specific purpose, work-release, or for a limited period. His only quarrel is with the sufficiency of the evidence of the requisite mental state, which for purposes of this case we will assume is intentional conduct. In support of his position, Reynolds relies on *State v. Rocque,* 104 Idaho 445, 660 P.2d 57 (1983), which held that Rocque could not be convicted of escape for failing to return to jail while out on work-release granted as part of his probationary sentence.

■■■ KRS 501.020(2) states that "[a] person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause that result or to engage in that conduct." It is well established that mens rea and intent may be established by or inferred from circumstantial evidence. *See, e.g., Stopher v. Commonwealth,* Ky., 57 S.W.3d 787, 802 (2001)("intent may be inferred from actions because a person is presumed to intend the logical and probable consequences of his conduct, and a person's state of mind may be inferred from actions preceding and following the charged offense."); *Harper v. Commonwealth,* Ky., 43 S.W.3d 261, 265 (2001). Circumstantial evidence is sufficient to support a criminal conviction. *See Baker v. Commonwealth,* Ky., 860 S.W.2d 760, 761 (1993); *Bussell v. Commonwealth,* Ky., 882 S.W.2d 111, 114 (1994). Finally, intoxication is a defense to an offense only if it prevents a person from forming the requisite intent, and mere drunkenness will not raise this defense. *See, e.g., Rogers v. Commonwealth,* Ky., 86 S.W.3d 29, 44 (2002). Reynolds did not assert or request instructions on an intoxication defense at trial and the evidence did not support an instruction on this defense. *See generally Taylor v. Commonwealth,* 995 S.W.2d 355, 362 (1999)(challenge to

absence of instruction on intoxication unpreserved where defendant did not request or tender intoxication instruction).

■ Captain Snow testified that he told Reynolds that if he did not work because of bad weather, he had to report back to the jail. Asher, Wright, and Gills all stated that at various times, they discussed with Reynolds his obligation to return to the jail by approximately 5:30. Rather than return to the jail after Asher told his employees at noon that they did not need to return to work, Reynolds and Wright continued to drive around drinking beer. Even after leaving Asher's home/office at approximately 4:30, Reynolds went to Gills' motel room and proceeded to stay for several hours drinking beer. Despite the obvious potential problems associated with driving back to the jail, Reynolds continued to drink alcohol and did not even attempt to return to the jail until very near or after his designated time to return of which he does not dispute he was fully aware. Reynolds was approximately 14 hours late in returning to the jail and never attempted to obtain permission for or notify the jail that he would be late. Reynolds's testimony was the only evidence concerning his whereabouts after leaving Gills' motel room and his alleged problems with the weather conditions.

Reynolds's reliance on *State v. Rocque, supra* is misplaced. First, that case from the Idaho Supreme Court is not binding on this Court. Second, it is distinguishable because Rocque was participating in the work-release program as a condition of probation and not while serving a term of incarceration. The court held that Rocque's confinement in the jail during evening hours was a result of a "voluntary probation agreement" and his failure to return to jail was a break of the terms of probation and not an escape. The court specifically noted the unusual circumstances of the case with respect to the requirement for "confinement" under the Idaho statute. 104 Idaho at 446, 660 P.2d at 58. In our situation, Reynolds's status as a person serving a misdemeanor conviction granted work-release clearly made him subject to the Kentucky escape statutes.

On a directed verdict motion, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth and the jury is free to determine the credibility of the witnesses. We believe there was sufficient evidence to infer that Reynolds did not intend to return to the Carroll County Detention Center at the time designated for his return authorized under his work-release. The fact that Reynolds eventually returned to the jail voluntarily does not preclude a conviction but is merely one fact to be considered. Viewing the evidence as a whole and in the light most favorable to the Commonwealth, there was sufficient evidence for a reasonable juror to believe that Reynolds was guilty of escape in the second degree. Consequently, the trial court did not err in denying Reynolds's motions for directed verdict.

For the foregoing reasons, we affirm the judgment of the Carroll Circuit Court.

ALL CONCUR.